AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
JUL 31 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| United States of America | ) |
|---|---|
| v. | ) |
| JULIO CESAR VIERA CHIRINOS | ) Case No. |
| | ) UNDER SEAL |
| | ) |
| | ) |
| *Defendant(s)* | ) |

3  19  71156  **MAG**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 5, 2018,__ in the county of __Alameda__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and (b)(1)(C) | Possession with intent to distribute controlled substances |

This criminal complaint is based on these facts:
See attached affidavit of DEA SA Eric Diamond.

☐ Continued on the attached sheet.

Approved as to form  /s/ Julie D. Garcia
AUSA  Julie D. Garcia

_Complainant's signature_

Eric J. Diamond, DEA Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: July 30, 2019

_Judge's signature_

City and state:  San Francisco, CA
Thomas S. Hixson, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Eric J. Diamond, a Special Agent of the Drug Enforcement Administration (DEA), being sworn, hereby declare as follows:

### INTRODUCTION

1. I submit this Affidavit in support of an application for a criminal complaint charging JULIO CESAR VIERA-CHIRINOS ("JULIO") with a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (possession with intent to distribute controlled substances).

2. The statements in this Affidavit are based on my own investigation; information from other law enforcement agents, investigators, and individuals with knowledge of this matter; my review of documents related to this investigation; and my training and experience as a DEA Special Agent. This Affidavit does not purport to set forth all of the evidence gathered to date in this investigation, or to name all of the persons who participated in these crimes; I have included only those facts that I believe are necessary to establish probable cause for the requested criminal complaint and arrest warrant.

### RELEVANT STATUTES

3. Under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), it is unlawful for a person to knowingly or intentionally manufacture, distribute, or possess with intent to distribute, controlled substances, including cocaine, its salts, optical and geometric isomers, and salts of isomers; and a mixture or substance containing a detectable amount of heroin.

### BACKGROUND OF INVESTIGATING AGENT

4. I am employed by the United States Department of Justice, DEA, as a Special Agent ("SA") and have been so employed since September 2014. I am presently assigned to the Oakland Resident Office ("ORO") in California.

5. I have received formal training at the DEA Training Center in Quantico, Virginia. This twenty-week DEA Basic Agent Academy included instruction on, among other things, basic narcotic investigations, drug identification, drug detection, familiarization with United States narcotics laws, money laundering techniques and schemes, identification and seizure of drug-

In Re App. for Crim. Complaint                      1

related assets, undercover work, and physical and electronic surveillance operations. Prior to working for the DEA, I worked as a private attorney in California for approximately three and a half years and as an Attorney for the Orange County District Attorney's Office in Santa Ana, California, for approximately five months as part of the Trial Attorney Partnership ("TAP") Program. Prior to working as an attorney, I served as a Certified Law Clerk for the Orange County District Attorney's Office. In my capacity as a TAP Attorney and Certified Law Clerk, I received experience conducting misdemeanor jury trials and felony drug preliminary hearings.

6. In addition to the above, I have spoken to and worked with more experienced federal and state narcotics agents and officers. During my tenure with the DEA, I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major traffickers, and while assigned to the ORO, I have participated in numerous investigations of illicit drug trafficking organizations and organized criminal enterprises in the Northern and Eastern Districts of California. The investigations have involved the use of confidential sources (CSs), wire and physical surveillance, telephone toll analysis, investigative interviews, and the service of search and arrest warrants. I have conducted investigations into unlawful possession with intent to distribute and distribution of controlled substances, laundering of monetary instruments, and the associated conspiracies involving such conduct. These investigations have included the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, conducting monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, in violation of 21 U.S.C. §§ 841(a)(1) and 846, which have resulted in state and federal prosecutions of individuals who have possessed, smuggled, received, and/or distributed controlled substances including: cocaine, heroin, methamphetamine, prescription pills (including counterfeit), and fentanyl, as well as the seizure of those illegal drugs and proceeds from the sale of those illegal drugs.

7. In conducting these investigations, I have employed a variety of investigative techniques, including physical and electronic surveillance, analysis of telephone records and pen

register data, interviewing witnesses, service of search and arrest warrants, and the drafting of criminal complaints, as well as handling informants and cooperating sources. In the course of these investigations, I have, at various times, participated in, planned, and/or supervised numerous instances of physical surveillance and electronic surveillance. Moreover, I have directed informants and have monitored meetings and consensual telephone conversations involving undercover agents and informants. I have participated in over one hundred and fifty hours of surveillance of narcotics traffickers. During surveillance, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods narcotics traffickers used to conduct clandestine meetings.

8. I have participated in more than six investigations in which court-authorized Title III interceptions were used in narcotics and money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language and which were later corroborated by surveillance or defendants' statements, and I have participated in seizures of narcotics and narcotics proceeds that resulted from the monitoring of these types of conversations. I also have interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of their coded language used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or be confused by the conversation since it would not make sense to that person.

9. In addition, I have participated in approximately two follow-up investigations concerning the concealment of assets, money, bank records, etc., and the identification of co-conspirators through the use of drug ledgers, telephone records and bills, photographs, and financial records.

10. I have been involved in the execution of more than forty state and federal narcotics related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of fentanyl, marijuana, heroin, cocaine, methamphetamine, and other controlled substances. I am familiar with and aware of the terminology used by illegal drug traffickers concerning narcotics and narcotics dealing.

11. I have interviewed more than fifteen drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users. I have become familiar with the manner in which illegal drug traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotic traffickers use telephones, cellular telephone technology, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

12. I have participated in approximately ten Organized Crime Drug Enforcement Task Force ("OCDETF") investigations. OCDETF is a task force comprised of law enforcement agencies that jointly investigate drug trafficking organizations. Through these investigations, I have gained expertise in the use of a variety of law enforcement techniques, including the application and use of electronic and wire interceptions, confidential informants, physical surveillance techniques including pole cameras and recorders and various other types of electronic surveillance techniques such as body wires and transmitters. Additionally, I have gained knowledge and expertise in the use of telephone toll analysis and the analysis of traditional types of records, including financial, telephone, utility records, and nontraditional records including records maintained by narcotic traffickers listing amounts of drugs delivered and amounts of money owed (pay and owe sheets). I have also gained knowledge and expertise in the collection and identification of drug evidence, and the analysis and interpretation of

recorded conversations collected by the methods detailed above.

13.     I have also had discussions with other law enforcement officers and confidential informants about the packaging and preparation of narcotics, the methods of operation, and security measures that are often employed by narcotics traffickers. I have examined documentation of various methods in which methamphetamine and other illicit drugs are smuggled, transported and distributed.

## STATEMENT OF PROBABLE CAUSE

**A.     In late May 2018, officers twice saw JULIO come outside 2534 Maine Avenue in Richmond, CA, and engage in suspected drug transactions.**

14.     In early 2018, officers from the San Francisco and Richmond Police Departments ("SFPD" and "RPD," respectively) began investigating individuals suspected of distributing drugs in the San Francisco Bay area, including JULIO Viera.

15.     On May 29, 2018, officers set up surveillance at 2534 Maine Avenue in Richmond, CA, which they believed to be JULIO's residence after seeing him come out of the house during morning hours in shorts and slippers.

16.     At about 10:13 am on May 29, 2018, a black Honda Accord with California license plate 8BNT116 (the "Black Accord") double parked across the street from 2534 Maine Avenue.[1]

17.     About a minute after the Black Accord parked, JULIO came out of the house and

---

[1] The Black Honda was registered to an "Elmer Bonilla." Earlier the same month, on May 2, 2018, DEA agents had seen the Black Honda in connection with another drug-trafficking investigation. Specifically, on May 2, 2018, an undercover law enforcement agent made two controlled purchases of heroin from two individuals whom I will call "Individual 1" and "Individual 2." Following the second purchase, agents saw Individuals 1 and 2 return to their apartment. The two then left the apartment on foot, and agents lost sight of them. A short time later, agents saw the Black Honda pull up to the apartment, and Individuals 1 and 2 got out. Based on surveillance, an analysis of the phone records for Individual 1's phone, and their knowledge of the investigation, the agents believed that Individual 1 and 2 had gotten into the Black Honda to repay the driver for heroin that he/she had supplied earlier in the day.

Additionally, on June 6, 2018, SFPD and RPD officers executed search warrant at 633 S. 24th Street in Richmond. Inside the apartment, the officers found more than 5 pounds of narcotics and more than $72,000 in cash. An individual named "Elmer Bonilla Matute" (to whom the Black Honda was registered) was inside the apartment. The Black Honda was parked about a block from the residence.

In Re App. for Crim. Complaint                 5

approached the car. Moments later, JULIO stepped away from the Black Accord and carried a white plastic bag into 2534 Maine Avenue. The Black Accord then drove away.

18.     Electronic surveillance showed that throughout the day and nighttime hours of May 29, 2018, the Black Accord made numerous stops within Oakland.

19.     On May 31, 2018, officers again set up surveillance near 2534 Maine Avenue. In the morning, officers saw the Black Accord park across the street from 2534 Main Avenue. Moments later, JULIO came out of the house and walked to the car's driver's-side window. SFPD Officer Brenton Reeder saw JULIO reach into the driver's window and then pull out a quart-size plastic bag that appeared to be filled with a light-colored substance. Based on his training and experience, Officer Reeder believed that the packaging of the substance was consistent in appearance with material used for the packaging of narcotics such as cocaine, methamphetamine, and heroin. JULIO immediately carried the plastic bag into 2534 Maine Avenue.

20.     Based on my training and experience and knowledge of this case; the fact that Officer Reeder saw JULIO retrieve suspected drugs from the Black Accord on May 31, 2018; the fact that JULIO also retrieved a plastic bag from the Black Accord on May 29; the fact that the Black Accord made several other stops in Oakland after the suspected drop on May 29; the fact that DEA agents saw the Black Accord drop off two known drug dealers after a controlled purchase on May 2, 2018; the fact that the Black Accord was a block away from 633 S. 24th Street when a large quantity of drugs and drug proceeds, along with a person named "Elmer," were found there on June 5, 2019; and the fact that (as described below) drugs were seized from 2534 Maine Avenue the following week, I believe that on both of the occasions described above the driver of the Black Accord delivered drugs to JULIO.

      **B.**     **On June 5, 2018, officers executed a search warrant at 2534 Maine Avenue and seized more than 30 grams of black-tar heroin and indicia of distribution.**

21.     On June 4, 2018, Detective Hoffman and Officer Reeder obtained a state search warrant to search 2534 Maine Avenue, which is a 2-bedroom home. Officers executed the

search warrant the next day at about 6:00 am.

22. The officers found JULIO in a bedroom off the main room of 2534 Maine Avenue, along with booking paperwork from SFPD listing JULIO's full name. The agents also found in that room a press-lock bag containing 0.3 grams of cocaine.

23. Officers also found a second individual (Individual 3) in the house. Individual 3 told officers he had just arrived in the country approximately one week prior.

24. The officers did not find any other people in the house.

25. The officers found and seized numerous plastic baggies and paraphernalia associated with narcotics trafficking in the kitchen and main living room.

26. In the southwest bedroom/storage area, the officers found an air compressor that had been modified to contain a hidden compartment. Inside, the officers found:

- A quart-size, plastic, press-lock bag, lined in the interior with a dark-colored lubricant substance. The bag was double-lined, at the interior, with a second quart-size, plastic, press-lock bag. Within the interior bag was a knot-tied, fold-top sandwich bag, with multiple press-lock bags containing black-tar heroin with an approximate weight of 31.4 grams. Based on my training and experience, I know that this amount of heroin is a distribution quantity. I also know that drug traffickers commonly package drugs in double-lined bags with grease in between them because the traffickers believe that the grease will prevent a drug-detection canine from smelling the drugs.
- Two quart-size, plastic, press-lock bags, one lined in the interior with a red lubricant substance and the other lined with a brownish green lubricant substance. Each bag was double-lined with a second quarter-size, plastic, press-lock bag.
- Two notebooks containing pay/owe sheets. I know based on my training and experience that drug dealers maintain "pay/owe" sheets so they can keep track of the quantities of drugs they have sold others, how much money those individuals owe them, and potentially how much money they (the dealers) owe others.

27.     Also in the room was a commercial food grinder. I know based on my training and experience that food grinders are commonly used in the processing of narcotics.

28.     Officers did not find any paraphernalia indicative of drug use at the house.

29.     In the backyard of the house, officers found a Mitsubishi Eclipse with California license plate 4YRY985. As of July 2019, that car was registered to "Julio Cesar Viera Chirinos" at 2534 Maine Avenue in Richmond (although it now has California license plate 8DEV337).

## C.     Officers later saw JULIO driving cars registered to him at 2534 Maine Avenue.

30.     On June 27, 2019, SFPD officers conducted surveillance at 281 MacArthur Boulevard in Oakland and saw JULIO driving a dark-colored Honda sedan with California license plate 8HIY552. That car is registered to JULIO at 2534 Maine Avenue, and the registration is valid from December 22, 2018, through December 22, 2019.

31.     The previous license plate of the Honda sedan was 8DZB113; a records check of that license plate showed that the sedan was registered to JULIO at 2534 Maine Avenue from December 22, 2017, through December 22, 2018.

## CONCLUSION

32.     I believe based on the foregoing facts that there is probable cause to believe that JULIO CESAR VIERA-CHIRINOS has violated 21 U.S.C. § 841(a)(1) and 841(b)(1)(C).

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

_____
Eric Diamond
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on July 30, 2019.

_____
HONORABLE THOMAS S. HIXSON
United States Magistrate Judge